UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

                              :
PHYLLIDA O'BRIEN              :
                              :
                              :
                              :
v.                            :  CIV. NO. 3:04CV1150 (WWE)
                              :
ROGOVIN MOVING & STORAGE CO.  :
INC.                          :
                              :
                              :

BENCH RULING

This action arises from defendant's alleged wrongful
detention of plaintiff's property.  Plaintiff Phyllida O'Brien
claims that defendant Rogovin Moving & Storage, Inc. ("Rogovin")
wrongfully detained her property and avoided and deceived her and
her husband in an attempt to cover up defendant's alleged unfair
business practices.

On December 8, 2006, in ruling on summary judgment, Judge
Eginton found that defendant unlawfully detained plaintiff's
property from February 16, 2004 through April 5, 2005, the date
on which defendant released the property from its warehouse.
[Doc. #109]. Judge Eginton denied summary judgment on plaintiff's
claim that defendant violated the Connecticut Unfair Trade
Practices Act. Conn. Gen. Stat. §42-110b(a). [Doc. #133 (on
clarification)].  The case was referred for a bench trial on

plaintiff's CUTPA claim and a finding on damages.[1]

A bench trial was held on December 11-12, 2007. [Doc. ##144-145]. On February 29, 2008, the parties filed their proposed findings of fact and conclusions of law. [Doc. ##152, 153]. Responses were filed on March 20, 2008. [Doc. ##155, 156].


## I.  FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the entire record developed during the trial on December 11 and 12, 2007, the Court finds the following facts established.[2]


Joint Stipulations of Fact

1.    Plaintiff is a citizen of the United Kingdom and the owner
      of a home in Montaren, France, known as Domaine de Fos
      ("Fos"). [Joint Stip.; Doc. #135-4, ¶1].

2.    Defendant is a small, family-owned and operated moving and
      storage company located in New London, Connecticut. [Doc.
      #152, Def. Stat. ¶2].

_____

[1]The parties consented to proceed before a United States Magistrate Judge [Doc. #142] on November 30, 2007, with appeal to the Court of Appeals.

[2]Trial transcripts were filed on January 24, 2008. [Doc. ##149, 150].

3.  Beginning in 1996, plaintiff utilized defendant for the
    storing and shipping of certain furnishings and other
    personal property (the "Property") which had been located at
    plaintiff's homes in New York and Missouri.  [Joint Stip.;
    Doc. #135-4, ¶2].

4.  The Property had been shipped to defendant by several
    shippers, including Allied Van Lines, the moving company
    with which defendant is affiliated.  Id. ¶3.

5.  Beginning in 1996, the Property was stored in overseas
    shipping containers at defendant's place of business in New
    London, Connecticut.  Id. ¶4.

6.  Plaintiff intended to offer Fos for rent to the general
    public during the summer of 2004 and retained the services
    of two agents to market Fos.  Arrangements regarding the
    rental of Fos for the summer of 2004 began as early as May
    2003.  Id. ¶5.

7.  Before plaintiff could advertise, show or rent Fos, the
    Property retained in New London by defendant had to be
    delivered to and placed in Fos.  Id. ¶6.

8.  Defendant originally was supposed to ship the Property to
    plaintiff in the fall or winter of 2003. The parties
    ultimately agreed that the shipment would occur no later

than February 15, 2004.  <u>Id.</u> ¶7.

9.  On January 25, 2004, Denis O'Brien, plaintiff's husband,

    sent defendant a fax, received by defendant, repeating

    earlier requests that defendant forward relevant documents

    and a bill relating to the upcoming shipment of the

    Property.  Mr. O'Brien emphasized to defendant that the

    Property was necessary in order to furnish Fos, that Fos

    could not be rented without the Property, and that the

    Property had to be shipped no later than February 15, 2004,

    in order to arrive in time for the 2004 summer season.  <u>Id.</u>

    ¶8.

10. Defendant repeatedly failed to comply with plaintiff's

    requests and the property was not shipped on the promised

    date of February 15, 2004.  <u>Id.</u> ¶9.

11. Between January 25, 2004 and March 15, 2004, Mr. O'Brien

    telephoned defendant several times and sent letters

    requesting the necessary invoice and other information

    required to effect the shipment of the property.

    Defendant's contact person, Sarah Rogovin, repeatedly told

    Mr. O'Brien that she would send the requested paperwork and

    ship the Property forthwith, yet she never did so.  Ms.

    Rogovin dreaded speaking with Mr. O'Brien and her false

assurances regarding the imminent production of the invoice and shipment were offered merely to pacify him. Id. ¶10.

12. On March 15, 2003, Mr. O'Brien sent defendant another fax, informing defendant that he and plaintiff had engaged a lawyer in order to locate plaintiff's property and to expedite its shipment to France. On the same date, Attorney Frank Eppinger, on behalf of plaintiff, contacted defendant in another effort to obtain the Property. Id. ¶11.

13. On April 2, 2004, plaintiff sent a fax to Allied Van Lines, authorizing and instructing Allied to retrieve the Property from defendant and ship it to France. Plaintiff also requested that Allied fax to her a copy of Allied's invoice for the charges in connection with the shipment. Plaintiff explained that she had not received an invoice from defendant and that the shipment could not be delayed any longer. Plaintiff proposed that, as an indication of good faith, she deposit with her attorney the funds necessary to pay the pending charges. Id. ¶12.

14. On or after April 6, 2004, defendant produced an invoice delineating the amounts being charged to plaintiff for the storage and shipment of the Property. Id. ¶13.

15. On or about April 14, 2004, Attorney Eppinger, on behalf of

plaintiff, faxed to defendant a letter acknowledging that he had received the invoice and requesting that defendant reduce the charges for storage by $30,000 in an attempt to compensate plaintiff for at least two lost weeks of rentals for the 2004 summer season at $15,000 per week.  Defendant refused to make such an adjustment.  Id. ¶14.

16.  Unable to reach a satisfactory arrangement, plaintiff initiated this litigation and filed a motion for the prejudgment remedy of replevin on July 13, 2004.  Id. ¶15.

17.  On or about August 11, 2004, after this litigation commenced, defendant submitted a second invoice, demanding an additional $7,510.58 for storage fees that had accrued since February 16, 2004.  Id. ¶16.

18.  In September 2004, in order to recover her possessions, plaintiff paid defendant $76,253.39, for outstanding expenses and charges through September 12, 2004, for shipping and storage of her Property. Id. ¶17.

19.  Defendant still failed to ship the Property. Id. ¶18.

20.  On March 4, 2005, Judge Fitzsimmons granted plaintiff's motion for replevin and issued an order regarding same on March 22, 2005.  Defendant released plaintiff's Property from its warehouse on April 5, 2005. Id. ¶19.

21. The Court has found the plaintiff satisfied each element under her replevin and wrongful detention claims pursuant to Conn. Gen. Stat. § 52-515 - including plaintiff's general or special property interest in the Property and right to immediate possession of the Property - and that plaintiff is entitled to damages caused by defendant's wrongful detention of plaintiff's Property. Id. ¶20.

22. Defendant wrongfully detained plaintiff's Property from at least February 16, 2004 until April 5, 2005, the date on which defendant released the property from its warehouse. Id. ¶21.

23. The damage suffered by plaintiff includes the loss of the use of the property which, in turn, necessarily caused the loss of the use of Fos, that is, its viability as a rental for the 2004 season. Id. ¶22.

24. In ruling on summary judgment, Judge Eginton stated, "[h]aving found that plaintiff is entitled to damages accrued from February 16, 2004 to April 5, 2005, it is necessary for the Court to conduct a hearing in order to determine the proper amount of damage plaintiff is owed stemming from this time period." [Doc. #109 at 7; Stip. ¶23].

25. Defendant is and was a "person" within the meaning of Conn. Gen. Stat. §§ 42-110a. [Stip. ¶24].

26. Defendant engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. §§ 42-110a, et seq., including in its dealings with plaintiff. Id. ¶25.

Findings of Fact

27. Fos was originally constructed in 1840 and is located about two (2) miles outside of Luzes in the Provence region of France. [Doc. #151, Pl. Stat. ¶26].

28. After acquiring Fos, the O'Briens invested in and oversaw significant renovations and improvements to the property, including extensive landscaping and the addition of an in-ground swimming pool. Id. ¶27.

29. Fos has available eight (8) bedrooms for use by renters. Id. ¶28.

30. Throughout the time period from 1996 through 2006, Mrs. O'Brien was not the primary contact who dealt with Rogovin regarding the Property. Id. ¶29.

31. Mrs. O'Brien authorized her husband, Denis O'Brien, to coordinate all issues related to the Property with Rogovin on her behalf. Id. ¶30.

32. Because Rogovin refused to deliver the Property to Fos

8

despite repeated requests, Mrs. O'Brien eventually decided to retain legal counsel to assist her in addressing Rogovin's misconduct. Id. ¶31.

33. Mrs. O'Brien authorized Mr. O'Brien to assist her in securing legal counsel for this purpose. Id. ¶32.

34. As a result of retaining legal counsel, Mrs. O'Brien incurred costs and fees. At the time of trial (including all fees incurred through October 31, 2007), these fees and costs were $151,052.76. In light of the trial, and preparation therefor, these costs and fees rose (through January 31, 2008) to $202,315.93, and continue to accrue. Id. ¶33.

35. Because the O'Briens do not live there for any fixed dates, Fos is available for rental on a flexible schedule. Id. ¶34.

36. Generally, the O'Briens spend most of their time at Fos during the winter season, for no more than five (5) to six (6) months out of the year. Id. ¶35.

37. Fos, however, is available for rental at any time during the year. Id. ¶36.

38. The vast majority of furnishings displayed in the photographs submitted into evidence as plaintiff's Exhibits 20 through 23 display the Property that was wrongfully

detained by Rogovin. Id. ¶37.

39. Plaintiff's expert, Sally Ahye, is currently employed by
    Quality Villas, a business specializing in the holiday
    rental of luxury villas. Quality Villas has been in business
    for approximately twenty-two (22) years. Id. ¶38.

40. Ms. Ahye currently serves as the Product Manger for the
    region of France and, as such, she is responsible for
    selecting properties which will be offered in the French
    portfolio of Quality Villas.  She further possesses the
    authority to set the rental prices on all property offered
    in the French portfolio. Id. ¶39.

41. Prior to her position as Product manager, Ms. Ahye served as
    a member of the sales and reservation team at Quality
    Villas. Id. ¶40.

42. In the past, Ms. Ahye worked for two (2) real estate
    companies and further worked for a national United Kingdom
    newspaper in the travel advertising department.  Id. ¶41;
    Tr. Dec. 11, 2007 at 160-61.

43. From her experience at Quality Villas, Ms. Ahye has had the
    opportunity to observe the performance of rental properties
    from one season to the next. Quality Villas integrates
    information acquired from this experience into the

establishment of appropriate pricing for properties offered in the Quality Villas brochure. <u>Id.</u> ¶42; Tr. Dec. 11, 2007 at 161-62.

44. At Quality Villas, the brochure production process begins in May of each year. Regional representatives from France and Italy initially have discussions with Ms. Ahye concerning local trends and property performance. These discussions are followed by meetings with the entire staff of Quality Villas where final decisions are made with respect to property selection. <u>Id.</u> ¶43.

45. Plaintiff's expert, Ms. Ahye, concluded that had Fos been furnished with the Property, it would have achieved at least five (5) weeks of rentals for the 2004 season. <u>Id.</u> ¶44.

46. Plaintiff's expert further concluded that had Fos been on the rental market in 2004, it would have achieved at least two (2) additional weeks for the 2005 season - for a total of seven (7) weeks of rentals. <u>Id.</u> ¶45.

47. The 2004 and 2005 rental seasons were comparable rental seasons. <u>Id.</u> ¶46.

48. Rental properties do better in their second rental season, as compared to the first. As explained by Ms. Ahye, based on her experience in the luxury villa rental industry, this

improvement in performance is the result of several factors.
First, both the agency and clients become more familiar with
an offering in this second year.  Second, and somewhat
related to the first factor, Quality Villas' familiarity
allows it to better promote and sell a property in its
second season.  <u>Id.</u> ¶47.

49.  There are limited instances where a rental property does not
do better in its second rental season.  This could result
where: 1) renters have a negative experience with the
property during its first season; 2) market conditions
change dramatically; and 3) when the property owner makes
significant alterations to what is being offered with the
property. As explained by plaintiff's expert, however, none
of these factors was a concern for Fos in the 2005 rental
season.  <u>Id.</u> ¶48.

50.  Each of the comparable properties selected by plaintiff's
expert witness experienced increased rentals in its second
year on the rental market and supported the conclusion she
reached with respect to Fos.  <u>Id.</u> ¶49.

51.  Fos was rented through Quality Villas at the price of £8,995
per week.  Ms. Ahye opined that the loss of two additional
weeks of rentals in the 2005 season resulted in damages in

the amount of £17,990.  Applying the applicable conversion

rate of $2.0457, Mrs. O'Brien lost $36,802.14 in potential

rentals in the 2005 rental season as a result of Rogovin's

conduct. Id. ¶50.

52. Plaintiff's expert stated that commercial rentals would

always be referred to their clients for consideration.  Ms.

Ahye further stated that higher end properties, such as Fos,

are a more likely target for commercial bookings. Id. ¶51.

53. Quality Villas would not have permitted Fos to be marketed

and rented unfurnished. Prospective renters of luxury

holiday villas, such as Fos, are not interested in renting

properties that are unfurnished.  Id. ¶52.

54. Assuming, arguendo, that it were possible and reasonable to

have listed photos or otherwise advertised Fos in 2004,

plaintiff would never have been able to carry out the

promise of rentals because the Property necessary to furnish

and rent Fos was not obtained from Rogovin until 2005.

Plaintiff would never have considered marketing Fos as if it

were furnished, only to have renters show up and realize

that was not the case, nor would that be reasonable.  Id.

¶53.

55. Plaintiff's expert explained that the 2006 rental season for

the Provence region was an anomaly and that the region as a whole experienced a drop off in rentals. Plaintiff's expert concluded that the 2006 rental season was not comparable to either the 2004 or 2005 rental seasons. Rather, the next comparable rental season was 2007. Id. ¶54.

56. Fos was rented for five (5) weeks in its first rental season (2005) and gained an additional two and a half (2.5) weeks in the next comparable year (2007), renting for seven and a half (7.5) weeks in 2007. Plaintiff's expert did not even possess the 2007 rental statistics at the time she reached that same conclusion in her report. Id. ¶55.

57. Plaintiff and Mr. O'Brien were living in Fos in November 2005. Id. ¶55 (Plaintiff's proposed findings of fact contain two (2) paragraph 55).

58. France experienced at least two phenomena during the Fall 2005 and Winter/Spring 2006. In 2005, it began with an incident in Paris, in an area with a predominately Muslim population, where certain individuals attempted to flee a crime scene and were shot by police. This provoked the beginning of some of the worst riots ever seen in France, reminiscent of those occurring in 1968. The riots were extremely serious; in Paris alone, at least nine thousand

(9,000) cars were torched. The situation was so significant that the French government warned tourists coming to France that it would be dangerous for them to take either a taxi, a bus, or the train service into Paris, because one would pass through districts where a tourist's life would be in danger. Id. ¶56.

59. This situation continued for a full month, into December 2005. Id. ¶57.

60. During this time, "all across the world, CNN, the BBC, all the newspapers carried very dramatic photographs of this problem." Id. ¶58.

61. Notably, France has the largest Muslim population in Europe. The riots spread and developed in the largest Muslim populated areas, the first being Paris, the second being "the south of France, but particularly in Provence." Id. ¶59.

62. Thus, during the initial period when one would most likely book a vacation villa in Provence for the 2006 season, i.e. Fall/Winter 2005, would-be tourists were viewing the largest French riots since 1968, with much of the violence occurring in the same region as Fos. Id. ¶60.

63. These events negatively affected the 2006 rental season.

<u>Id.</u> ¶61.

64. A similar phenomenon occurred in February 2006. Radical student groups began to protest the implementation of a new rule allowing employers to hire or fire new workers. Unions joined the protests and violence followed. Again, these were the most violent protests/strikes in France since 1968. <u>Id.</u> ¶62.

65. The protests, which began in Paris, once again spread to Provence. <u>Id.</u> ¶63.

66. These two violent events "led to a huge decline in tourism . . . in particular . . . the Provence area." <u>Id.</u> ¶64.

67. Both events negatively affected the 2006 rental season. <u>Id.</u> ¶65.

68. There were no such riots or strikes in November 2004 through February 2005 that would have affected the 2005 rental season. <u>Id.</u> ¶66.

69. There were no such riots or strikes in November 2006 through February 2007 that would have affected the 2007 rental season. <u>Id.</u> ¶67.

70. Fos rented for seven and a half (7.5) weeks during the 2007 season. <u>Id.</u> ¶68.

71. The seven and a half (7.5) weeks of rentals in 2007 reflects

a two and a half (2.5) week increase over the previous comparable rental season, i.e. 2005, almost exactly (in fact, slightly more than) what Ms. Ahye predicted in early 2006, before this data even existed. <u>Id.</u> ¶69.

72. Mr. O'Brien handled numerous issues related to Fos on behalf of his wife, including issues related to the Property (furnishings) and issues related to Rogovin. <u>Id.</u> ¶70.

73. Mr. O'Brien dealt exclusively with one representative of Defendant, Sarah Rogovin. <u>Id.</u> ¶71.

74. During her communications with Mr. O'Brien, Ms. Rogovin was representing Defendant. <u>Id.</u> ¶72.

75. With respect to the current dispute, that is, removal of the Property from storage at Rogovin, Mr. O'Brien began communicating with Rogovin in May and June of 2003. <u>Id.</u> ¶73.

76. At that time, renovations to Fos were expected to be completed in September 2003, and Mr. O'Brien requested that the Property be delivered to Fos at that time. <u>Id.</u> ¶74.

77. One issue that had to be resolved was "where are we going to ship" the Property, with two (2) possible options: (1) the port of Marseilles, France, and (2) a port in England. <u>Id.</u> ¶75.

78.  Plaintiff had already begun communicating with rental agencies about renting of Fos for the 2004 rental season by the time Mr. O'Brien began coordinating with Rogovin about the delivery of the property. Id. ¶76.

79.  One of the primary reasons for communicating with Rogovin as early as May/June 2003 was to ensure that Fos could be rented for the 2004 rental season.  Id. ¶77.

80.  During the last two weeks of May, or early June, upon Mr. O'Brien's request, Rogovin agreed to ship the Property by September 2003. Id. ¶78.

81.  In or around June 2003, Rogovin indicated that it was doing or would do several things, including (a) that it was prepared to move the goods at any time; (b) get plaintiff an invoice "straight-away" without any problems; and (c) deliver all necessary documentation to plaintiff in advance of the planned September 2003 shipment.  Id. ¶79.

82.  Not one of those things occurred by September 2003.  In fact, there was no progress whatsoever between June and September 2003. Id. ¶80.

83.  In August 2003, after numerous unsuccessful attempts to reach Sarah Rogovin, Mr. O'Brien spoke to Ms. Rogovin and complained that nothing had transpired and Plaintiff had

18

received none of the necessary documentation, no invoice, and no answer as to which port would be utilized for delivery. Mr. O'Brien noted that Rogovin was "actually quite lucky" because, due to some delay with the renovations at Fos, shipment by September 2003 was no longer "require[d]." However, Mr. O'Brien emphasized that further delay would be problematic and that the Property had to arrive by December 2003. Id. ¶80.

84. During that August 2003 conversation between Ms. Rogovin and Mr. O'Brien, Ms. Rogovin apologized "profuse[ly]," instructed Mr. O'Brien not to worry, and promised to personally attend to the necessary tasks. Id. ¶82.

85. At that time, Ms. Rogovin made numerous "present tense" statements about the tasks Rogovin claimed to be undertaking, including that "the account books were already on her desk," that "she would proceed immediately to get out [an] invoice," and also that she would immediately "get on the phone to Allied" (the parent shipping company) to resolve the issue related to the ports. Id. ¶83.

86. Despite all of those assurances by Rogovin, the Property failed to ship by December 2003, as promised. Id. ¶84.

87. Furthermore, Rogovin once again failed to provide plaintiff

with an invoice or any other paperwork.  <u>Id.</u> ¶85.

88.  Indeed, even prior to December 2003, plaintiff remained
     concerned that Rogovin would not meet the most recently
     agreed upon shipping schedule.  When nothing occurred
     between August and October 2003, Mr. O'Brien again began
     making phone calls to Rogovin.  However, Ms. Rogovin would
     not take or return his calls.  <u>Id.</u> ¶86.

89.  During the November-December 2003 time frame, when Mr.
     O'Brien was able to speak with Ms. Rogovin, she continued to
     make comments consistent with those made during the August
     2003 time frame, i.e., that work had been and/or was being
     undertaken and that she would personally attend to the
     tasks, rather than admit that nothing had been done or would
     timely be done.  <u>Id.</u> ¶87.

90.  In late November 2003, after several unanswered phone calls,
     Ms. Rogovin again apologized, promised it would "never
     happen again," accepted personal responsibility for the work
     that needed to be done, guaranteed that it would be done,
     admitted that she had failed to carry out the necessary
     tasks and promised to deliver the documentation and invoice.
     <u>Id.</u> ¶88.

91.  Mr. O'Brien advised Ms. Rogovin that the situation was

"quite serious," and that they were "very quickly going to get to a point of no return." Id. ¶89.

92. Mr. O'Brien further provided Ms. Rogovin with Plaintiff's "drop-dead date" for delivery of the property of February 15, 2004. Id. ¶90.

93. By this point Mr. O'Brien had concluded that all of Rogovin's statements regarding the status of the allegedly current work, as well as contemporaneous promises of immediate action, were false. Id. ¶91.

94. Given the assurances by Ms. Rogovin, the defendant's false statements include repeated promises that certain actions would be taken "immediately," the falsity of which is borne out by the fact that such statements were made from at least June 2003 through December 2003, with none of the promised actions ever occurring. Id. ¶93.

95. In November 2003, when Mr. O'Brien and Ms. Rogovin agreed to the "drop-dead date" of February 15, 2004, Mr. O'Brien and Ms. Rogovin once again discussed the intervening tasks that must be accomplished and Ms. Rogovin again promised to complete them. Id. ¶94.

96. On or about January 15, 2004, Mr. O'Brien and Ms. Rogovin spoke on the telephone. By that time, they had been

discussing the transport of the Property and related tasks for over seven (7) months. Given that nothing had been accomplished up to that time, Mr. O'Brien and plaintiff began to believe that something had happened to the Property - perhaps a fire or theft-for they could see no other reason why Rogovin would refuse to deliver the Property or even issue an invoice. Id. ¶95.

97. Once again conveying the "extremely serious" nature of the delay, Mr. O'Brien explained that it was more than Plaintiff's comfort at issue; that she would be unable to rent Fos during the summer of 2004 if the Property were not shipped by February 2004. Id. ¶96. He reiterated that, "This is now as serious as I can possible transmit to you by telephone." Id. ¶96.

98. Once again Ms. Rogovin apologized, mentioned some problems she had been unable to deal with, and gave her promise-her "absolute promise [and] guarantee"-that plaintiff would get the invoice, that she (Ms. Rogovin) would prepare it herself, that the other documentation would be provided and that the Property would ship on or prior to February 15, 2004. Id.

99. Mr. O'Brien was skeptical, advising Ms. Rogovin that he had

"heard this before," and that "[up] [un]til now, nothing's been truthful in what you've said." <u>Id.</u>

100. In his January 25, 2004, fax to Rogovin [Pl. Ex. 1, Stip. ¶8; Pl. Ex. 2], Mr. O'Brien reminded Ms. Rogovin that she had plaintiff's and Mr. O'Brien's London telephone numbers the entire time the goods were in storage; and Ms. Rogovin also had plaintiff's and Mr. O'Brien's telephone numbers for Switzerland and Domaine de Fos (France). <u>Id.</u> ¶99.

101. Although Rogovin had contact information for plaintiff in three different countries, Rogovin never called plaintiff or Mr. O'Brien, even though Mr. O'Brien had left messages on "multiple . . . occasions." Indeed, Ms. Rogovin did not call Mr. O'Brien or plaintiff even after receiving the written correspondence dated January 25, 2004 [Pl. Ex. 2], in which Mr. O'Brien complained about Rogovin's non-responsiveness and failed performance. <u>Id.</u> ¶100.

102. By the time Mr. O'Brien sent Rogovin his March 15, 2004, fax [Pl. Ex. 3], a month had passed since the "drop-dead date" for shipment, and the Property still had not been shipped. <u>Id.</u> ¶101.

103. Between January 25, 2004 (the date of his previous correspondence, Pl. Ex. 2), and March 15, 2004, (Pl. Ex. 3),

Mr. O'Brien called Rogovin a minimum of fifteen (15) times but nothing had been achieved. Although she disputes the exact number of calls, Ms. Rogovin concedes that there were numerous phone calls during that time frame when nothing was accomplished. <u>Id.</u> ¶102.

104. As memorialized in plaintiff's exhibit 3, Ms. Rogovin represented numerous things to Mr. O'Brien, including: (1) promises of shipment; (b) getting the details together; (c) talking to her brother Aaron Rogovin ("Mr. Rogovin"), to assist with the file; and (d) constant promises to return phone calls, none of which was done. <u>Id.</u> ¶103.

105. Mr. O'Brien spoke to Ms. Rogovin again shortly before the March 15, 2004 fax and, after another round of apologies, Ms. Rogovin finally decided to turn the file over to Mr. Rogovin, another principal of defendant. However, Mr. Rogovin also did not accept or return Mr. O'Brien's telephone calls. On one such occasion, the receptionist first advised Mr. O'Brien that Mr. Rogovin was in his office, then that he was "preoccupied," and then that he had "just left the office." <u>Id.</u> ¶104.

106. Mr. O'Brien and plaintiff concluded that the only thing they had received from defendant were "lies . . .

misrepresentations, falsehoods . . . ," "almost been a complete game for them, that's the only was I could describe it . . . ." <u>Id.</u> ¶105.

107. In light of Rogovin's failure for approximately ten (10) months to perform any of the numerous tasks it had promised to perform, including failing to ship by the agreed upon "drop dead date," plaintiff hired a lawyer, Frank Eppinger, to attempt to recover plaintiff's Property from Rogovin. <u>Id.</u> ¶106.

108. By the time Mr. O'Brien sent the March 15, 2004 fax (Pl. Ex. 3), Mr. Eppinger had been retained to assist plaintiff in her dispute with Rogovin. <u>Id.</u> ¶107.

109. Even after plaintiff retained a lawyer, Rogovin was unresponsive. <u>Id.</u> ¶108.

110. Mr. O'Brien concluded that Rogovin's statements were lies/misrepresentations because, "[w]hen you were told countless times that someone is going to do something, and it never occurs, there's only one conclusion that one can reach, and that is it was a lie. It was a lie on Day 1, on the next conversation, for the next shipment, at each time along the way, and it doesn't stop." <u>Id.</u> ¶109.

111. Ms. Rogovin promised Mr. O'Brien that she, herself, would

perform specific acts, and would perform those tasks "immediately." She "personally guarantee[d]" that she would undertake those tasks. Far from a "prediction," which might depend on outside forces, Ms. Rogovin repeatedly failed to perform "immediate" tasks she had promised to undertake herself and over which she had complete control. There was no reasonable explanation for the failure to perform these promised tasks, which included returning phone calls; preparing an invoice; and shipping the Property even without finalization of paperwork. Id. ¶110.

112. Mr. O'Brien later learned that Ms. Rogovin was giving him deliberately false assurances regarding imminent conduct merely to "pacify him" because she dreaded speaking with him. Indeed, this was admitted in Ms. Rogovin's deposition, found by the court (Eginton, J.), and even stipulated to by Rogovin. Id. ¶111.

113. While at some point Mr. O'Brien and/or plaintiff began to suspect that they were being lied to, because they lived in Europe, they "were left in a position where all [they] could do was to urge - try and convince [Ms. Rogovin] to behave professionally, to get on with her job . . . and in the hope that whatever th[e] problem was, would resolve itself, and

somebody in that office would have the courage to just simply do their job." Id. ¶112.

114. On or about April 14, 2004, almost a year after plaintiff began requesting an invoice, Rogovin produced an invoice dated April 6, 2004, [Pl. Ex. 8]. The invoice was a one-page, seven-entry document, with a synopsis of storage periods. There was nothing about that document to indicate that its preparation was complicated or time consuming. Id. ¶114.

115. If Rogovin had told Mr. O'Brien, beginning in June 2003, "Mr. O'Brien, I dread speaking with you. You whine. I'm going through a difficult time right now. I will probably say what it takes to get you off the phone with me, but most of it is untrue. Nothing is in the works, and I will never timely send you an invoice, or timely ship your property," Mr. O'Brien (and, in turn, plaintiff) would have done things differently. He would not have spent time with telephone calls or similar tactics; plaintiff would have hired a lawyer immediately, sought replevin of the Property, and possibly salvaged a portion of the 2004 rental season. Id. ¶115.

116. A rental season for luxury villa rentals generally runs from

the 1ˢᵗ of November through the 31ˢᵗ of October, such that
the "2008 season" would run from November 1, 2007 through
October 31, 2008. Id. ¶116.

117. Given the February 15, 2004, "drop-dead date," the "2004
season" would have been condensed, and would have run from
March/April 2004 through October 31, 2004.  Id. ¶117.

118. 2004 was supposed to be the first year Fos was rented. Id.
¶118.

119. Plaintiff entered into a 2005 letting contract with Quality
Villas for the 2005 rental season on September 9, 2004. Fos
was added to the agency's website at that time.[Doc. #152,
Def. Stat. ¶17].

120. The rate to rent Fos was £8,995 per week. Quality Villa
charged a commission of 20% of the rental, which was
deducted from the sum of £8,995. [Doc. #152, Def. Stat.
¶18].

121. Plaintiff was unable to rent Fos in 2004 as a result of
Rogovin's wrongful detention of the Property. [[Doc. #151,
Pl. Stat. ¶119].

122. Plaintiff did not receive the Property that is the subject
of this dispute until May 11, 2005. Id. ¶120.

123. Fos was first rented in June 2005. Id. ¶121.

124. In other words, the 2005 season was the first season plaintiff possessed the Property and the first season plaintiff was able to rent Fos. Id. ¶122.

125. Plaintiff rented Fos for five (5) weeks in 2005. Id. ¶123.

126. All five (5) weeks were booked through one of plaintiff's two (2) rental agencies, Quality Villas. The ability to secure bookings through the other agency, CV Travel, was likely affected by the fact that CV Travel was in the process of being sold in 2005. Id. ¶124.

127. Of the five (5) weeks Fos was rented in 2005, three (3) weeks were booked at the residential rate of £8,995 per week, and two (2) weeks at a negotiated commercial rate of £19,500 for two (2) weeks. Thus, the total rental revenue from 2005 was £46,485. Id. ¶125.

128. Fos never rented for a rate less than £8,995 per week. Id. ¶126.

129. But for Rogovin's failure to timely deliver the Property, plaintiff would have been as ready, willing and able to rent Fos in 2004 as she was in 2005. Id. ¶127.

130. If Rogovin had shipped the Property by the promised "drop-dead date" of February 5, 2004, it would have arrived at the end of March or not later than early April 2004, in time to

go forward with the photographic sessions that had been scheduled with the rental agencies. Id. ¶129.

131. In 2005, plaintiff was approached by BBC, the British television network, regarding renting Fos a set for the filming of a television series during September 2005. Although negotiations were successful, the rental did not transpire because a new managing director later cut that series from the BBC budget. Had that rental occurred, plaintiff would have received £60,000 for the four (4) week commercial rental.  Id. ¶130.

132. With respect to storage charges incurred by plaintiff, Rogovin's original invoice (Pl. Ex. 8) charged for storage only through February 15, 2004, the agreed upon "drop-dead date" for delivery. After that date, Rogovin was wrongfully detaining plaintiff's Property.  Nevertheless, Rogovin, subsequently billed plaintiff for storage costs incurred after February 15, 2004 (Pl. Ex. 10).  Id. ¶131.

133. All storage costs ever billed by Rogovin, including charges for "storage" during the stipulated period of the wrongful detention, were paid in full by plaintiff in an effort to obtain possession of her Property. Id. ¶132.

134. If Rogovin had shipped the Property by February 15, 2004, as

it promised, plaintiff would not have incurred any storage
fees after February 15, 2004. <u>Id.</u> ¶133.

135. Plaintiff incurred those extra fees as a direct result of
Rogovin's improper handling of plaintiff's account. <u>Id.</u>
¶134.

136. The total amount of the storage overcharges, i.e., amounts
charged for storage occurring after February 15, 2004, is
$7,510.58. <u>Id.</u> ¶135.

137. The appropriate exchange rate, measured as of a date
immediately preceding the trial in this case (Pl. Ex. 18),
is $2.0457. In other words, £1=$2.0457.  <u>Id.</u> ¶136.

138. Plaintiff seeks $262,149.08 in damages, excluding interest,
as follows:

1.  The £46,485 in lost rentals for the 2004 season
equates to $95,094.36.

2.  The £60,000 value of the lost BBC rental (or
equivalent project) equates to $122,742.

3.  For an additional two(2) weeks of rentals plaintiff
would have earned in 2005 had 2005 been the second
rental season instead of the first, £17,990, which
equates to $36,802.14.

4.  Storage cost overpayment in the amount of

$7,510.58.

<u>Id.</u> ¶137.

139. Plaintiff also seeks attorneys' fees, interest, punitive damages and costs. <u>Id.</u> ¶138.

140. According to its principal, Sarah Rogovin, it is not Rogovin's standard practice to lie to its customers. In the ordinary course of its business, Rogovin's representatives make it a point to tell the truth, to the shipping companies it works with, to its customers, and to others with whom Rogovin is doing business. <u>Id.</u> ¶139.

141. According to its principal, Sarah Rogovin, mistakes are not the norm at Rogovin, rather they are the exception. <u>Id.</u> ¶140.

142. According to its principal, Sarah Rogovin, it is Rogovin's standard practice to live up to its word, and to fulfill its promises. <u>Id.</u> ¶141.

143. According to its principal, Sarah Rogovin, it is Rogovin's standard practice to perform in a timely manner. Untimely performance would be an "aberration," a "departure from the normal standard." <u>Id.</u> ¶142.

144. Sarah Rogovin admits that a failure to comply with a customer's request, and failure to fulfill a promise to that

customer, constitute departures from ordinary business practices.  <u>Id.</u> ¶143.

145. Sarah Rogovin admits that repeated failures to comply a with customer's requests, and repeated failures to fulfill a promise, are even further from the norm than single instances of such conduct. <u>Id.</u> ¶144.

146. Ms. Rogovin testified that she always tells the truth when she is under oath. <u>Id.</u> ¶145.

147. Ms. Rogovin does not dispute that, as early as June 2003, she began talking to Mr. O'Brien about producing an invoice and necessary paperwork, and transporting plaintiff's Property. <u>Id.</u> ¶146.

148. Ms. Rogovin admits that Mr. O'Brien called her numerous times between June 2003 and March 2004. <u>Id.</u> ¶147.

149. Ms. Rogovin, after giving conflicting testimony about alleged attempts to return Mr. O'Brien's phone calls, admitted that she never successfully returned a phone call, and never produced any phone record reflecting that any international calls had been made, despite being asked to do so.  <u>Id.</u> ¶148.

150. The information plaintiff was seeking from Rogovin included an itemization of storage costs, outstanding balances, and

fees and reimbursements related to payments to Allied

shipping company; in fact, these were issues Rogovin wanted

addressed as well. <u>Id.</u> ¶149.

151. Prior to April 2004, Rogovin never put anything, whether a

quote, a request for information, or any other document

related to the shipment, in writing, or sent any writing to

Mr. or Mrs. O'Brien. <u>Id.</u> ¶150.

152. Rogovin failed, for ten (10) months, to deliver the

information that plaintiff was seeking, although storage

costs were always known, outstanding balances were always

known, and reimbursements for Allied payments were always

known. <u>Id.</u> ¶151.

153. It was Ms. Rogovin's decision not to ship the Property to

plaintiff by the promised February 15, 2004 deadline, and

her "fault" that it did not ship. <u>Id.</u> ¶152.

154. Ms. Rogovin admits that there were many instances where she

promised to produce a bill, and did not do so. <u>Id.</u> ¶153.

155. Ms. Rogovin admits that her promises started in 2003 and

continued through, at least, March 2004. <u>Id.</u> ¶154.

156. Ms. Rogovin further admits that Mr. O'Brien had been

discussing the transport of the Property since at least June

2003; that Mr. O'Brien had telephone discussions with her

about that subject a minimum of seven (7) or eight (8) times
prior to January 25, 2004; that she had always had the
O'Briens' phone numbers and thus a way to reach them; and
that she never did reach them.  Id. ¶155.

157. Ms. Rogovin admits that Mr. O'Brien called her "several"
times between his January 25, 2004 fax (Pl. Ex. 2) and his
March 15, 2004 fax (Pl. Ex. 3), though she disputes that it
was "at least 15 times," as Mr. O'Brien stated.  Id. ¶156.

158. Ms. Rogovin admits that she made promises of shipment during
those conversations.  Id. ¶157.

159. Despite those promises, defendant admits that Rogovin did
not ship the Property.  Id. ¶158.

160. Although Sarah Rogovin admits making numerous promises and
assurances related to producing invoices and shipping the
Property, Ms. Rogovin denies that she was lying.  She
claims, instead, that each and every time she made such
statements she "was intending to ship the things," but that
two things were in play: (1) she "wasn't functioning"; and
(2) Mr. O'Brien was not providing necessary information.

    a.    However, Ms. Rogovin admits that she
promised to ship the Property even
without any additional information.

b. She also admits that "[n]ot functioning
   well" is not a legitimate business
   excuse for not performing. Her claimed
   reason for not functioning was the
   passing of her mother, whose death
   occurred seven (7) months prior to the
   promised ship date of February 15,
   2004.[3]

c. At the first deposition in this case,
   before Ms. Rogovin began describing the
   passing of her mother as her
   justification for not performing the
   duties of her job, her brother, Mr.
   Rogovin, the other principal of

---

[3]Ms. Rogovin testified that she was very worn down "working in the business and taking care of [her] mother, and [she] had worn herself down to . . . a nub." Looking back she believes she experienced an nervous breakdown and should have taken time off to get herself together. [Doc. #150 at 28-30]. While the Court does not doubt that Ms. Rogovin experienced pain and loss upon the death or her mother in July 2003, Rogovin's counsel provided no evidence of a "nervous breakdown" or other psychiatric condition during this time period. Nor, was Sarah Rogovin's brother, a principal of Rogovin, able to substantiate her claim that she was not functioning due to a psychiatric condition following her mother's death. Nevertheless, Ms. Rogovin's loss does not explain why she failed to provide timely invoices to plaintiff from 2000 going forward. [Pl. Ex. 8].

defendant Rogovin, testified under oath
that there were no "family, or family
business, problems" during 2003 to 2004
. . . "nothing that would affect the
running of the business . . .
"[a]bsolutely no family problems" . . .
"none at all."

Id. ¶159.

161. Ms. Rogovin admits that, during this time frame, her brother
     was not promising other clients that Rogovin would ship
     property, without finalizing paperwork, and failing to
     fulfill such promises.  Id. ¶160.

162. Ms. Rogovin also admits that she had no such failures with
     any other customer, other than plaintiff. Id. ¶161.

163. Ms. Rogovin concedes that, prior to March 15, 2004, she had
     promised to "get the details together," and admits that she
     did not do so. Id. ¶162.

164. Ms. Rogovin further concedes that she had agreed to talk to
     her brother to get help with plaintiff's file. Yet, she does
     not dispute that she failed to do so until March 2004, about
     ten (10) months after plaintiff began requesting her
     Property, and a month after Ms. Rogovin agreed upon a "drop-

37

dead date" for shipment of the Property. Id. ¶163.

165. Ms. Rogovin admits that she allowed at least eight (8) months to pass, unable to deal with Mr. O'Brien because she was "not functioning well," and yet never once asked for the help of her brother, who was functioning well, or turned the file over to him for handling. Id. ¶164.

166. She admits that, during this period, she made "constant promises" to return Mr. O'Brien's phone calls, but "never actually picked up the phone and successfully reached Mr. or Mrs. O'Brien." Id. ¶165.

167. On March 18, 2004, Ms. Rogovin advised plaintiff's counsel that she could produce the necessary documentation for the shipping of the Property within four days. Id. ¶166.

168. Specifically, she agreed to produce "a schedule for the shipment, as a whole . . . , in terms of paperwork, in terms of shipping, . . . everything to do with the shipment . . . ."; in other words, "all the paperwork that would go-that would be in advance . . . of the shipment." Id. ¶167.

169. Ms. Rogovin testified that she had the sincere intent to complete that promise, despite failing to fulfill many similar promises over the prior nine or ten months. At a minimum, this included a schedule for shipment and a bill

for storage and any other charges. In fact, she agrees that it would have included "all the information that was within Rogovin's possession, and ability to access and produce, in some type of paper form." <u>Id.</u> ¶168.

170. Although Ms. Rogovin claims that every single time she said "I'm gonna work on it," she "meant it," even she does not claim that she was being "logical or reasonable" when she said it.[4] <u>Id.</u> ¶170.

171. Ms. Rogovin admits that her statements that she "was working with [plaintiff's] file" began in 2003. <u>Id.</u> ¶171.

---

[4]She testified that,

> At the time, I would say "I'm gonna work on it," I meant it. I meant I was going to work on it, but I was sick, and I - Even though I intended to work on it, when I'd start trying to, I-I was afraid. I had developed, like - I was afraid of him. I was afraid of Mr. O'Brien, and for - Not- I'm not saying it was logical or reasonable, but it was just - I just found him very hard to deal with, and I just couldn't cope, and I intended, every time, to do what I needed to do, but when I would sit down and try to do it, I just couldn't, you now, because there was - His shipment was massive. There were lots of details. There was lots of information, and I could never focus and cut - you know, cut through to it.

[Doc. #150 at 47-48].

172. She admitted repeatedly that the work should have taken no more than four days.  <u>Id.</u> ¶172.

173. Ms. Rogovin testified that all of the data she needed to prepare an invoice for Mr. O'Brien had been in the computer since 2000. <u>Id.</u> ¶¶173-177.

174. Theresa Dovas, a Rogovin employee, was responsible for going on the computer, printing out data, and performing similar tasks from at least June 2003 through September 10, 2004. <u>Id.</u> ¶179.

175. Ms. Rogovin admitted that she never asked Ms. Dovas to get that information any time prior to March 26, 2004. <u>Id.</u> ¶180.

176. Despite an initial claim at trial that she had personally been looking up plaintiff's information all along, Mr. Rogovin eventually conceded that she had been telling the truth at her deposition when she testified that she had not done so prior to January 25, 2004. <u>Id.</u> ¶181.

177. Ms. Rogovin testified at her deposition that she had not looked up the information on the computer or in paper form at any time prior to March 26, 2004.  <u>Id.</u> ¶182.

178. She testified "[it]'s not [that] I didn't want [to look up

the information]. I felt unable to."[5] Id. ¶183.

179. Ms. Rogovin did not start compiling the information necessary to create an invoice until April 2, 2004. Id. ¶185.

180. Rogovin charged plaintiff by invoice generated in March 2006 for "handling charges" in complying with this Court's replevin order and, in doing so, Rogovin dated the invoice April 4, 2005, applied the wrong rate per one hundred pounds. Rogovin disputes that this invoice was "deceptive"

---

[5]Plaintiff further testified,

Q:   the reason why you had not done these things we talked about here today, until this date, was because you considered the O'Briens financially able people, that Mr. O'Brien was overseas, and that regardless, you knew you would hear from them again?

A:   No, I mean,--

Q:   Do you remember making --

A:   -those are all true things but, I mean, the reason that I didn't do it was because, as I said, I -Every time I sat down to start doing it, I would feel overwhelmed, and I had certain fears about dealing with Mr. O'Brien, and the things that he wouldn't answer, and it - and I just would become overwhelmed by my fears, about dealing - you know, dealing with him, and having the shipment go without, you know, all the information that I needed, and the whole thing. . . .

[Doc. #150 at 82].

by claiming it was simply numerous significant mistakes on top of each other. Id. ¶188.

181. Although Ms. Rogovin was solely responsible for selecting the rate she charged plaintiff, she claimed to have absolutely no idea how it was selected. Id. ¶189.

182. Rogovin's invoice (Pl. Ex. 12) was for $18,529.18, but, at the appropriate rate at the time the service was performed, the charge for services should have been no more than $1,524.97.[6] Id. ¶191.

183. Rogovin pursued a counterclaim against plaintiff, which plaintiff had to defend and on which plaintiff had to conduct discovery, for the allegedly-owed $18,529.18. Id. ¶¶192, 216. Defendant has not withdrawn its counterclaim, stating that "plaintiff's goods would have had to have been removed from storage, and labor performed, irrespective of whether the property was leaving the warehouse voluntarily

_____

[6]The property weighed 32,795 pounds. [Doc. #152 ¶9; Pl. Ex. 12; Pl. Ex 31]. As demonstrated at trial, Sarah Rogovin multiplied 32,795 by the 2006 handling charge to get the total rate of $18,529.18. [Pl. Ex. 12]. However, to properly calculate the handling charge per hundred pounds (cwt), the proper calculation for 2006 would be 327.95 multiplied by 5.65 equaling $1,852.91. [Pl. Ex. 31]. Plaintiff argues that the proper handling charge to be applied would be the 2005 rate of 4.65 cwt. Thus, 327.95 multiplied by 4.65 equaling $1,524.97. [Pl. Ex. 31].

or involuntarily, i.e. by court order." [Doc. #152, Def. Stat. ¶21]. Rogovin states that it "regrets the arithmetic error in the bill." Id. ¶22.

184. Rogovin also invoiced and charged plaintiff for storing the Property during the time Rogovin wrongfully detained it. Plaintiff paid this amount in full, $7,510.58 (Pl. Ex. 10), under protest, to recover possession of her Property. [Doc. #151, Pl. Stat. ¶194].

185. Ms. Rogovin admitted that this business practice was "[u]nfair." Id. ¶¶195, 216.

186. Ms. Rogovin admitted that she had "actually questioned" whether Rogovin should be issuing the August 11, 2004 Invoice (Pl. Ex. 10), which included storage charges after February 15, 2004, given that she had previously only charged for storage up to the promised "drop-dead date" of February 15, 2004. However, she issued it despite those reservations. Id. ¶196.

187. Ms. Rogovin admitted that "definitely, [she] shouldn't have charged [plaintiff] between February and April [2004]," but that Rogovin did anyway. Id. ¶197-98.

188. Mr. Rogovin further agreed that the entire storage period charged in plaintiff's Exhibit 10 is within the stipulated

period of the wrongful detention of plaintiff's Property. Id. ¶199.

189. Ms. Rogovin admitted that plaintiff paid in full, "including the period of time that [Ms. Rogovin] testified was unfair." Id. ¶200.

190. Ms. Rogovin admitted that: (a) she "agreed to ship the [P]roperty, even without finalization of paperwork, by February 15, 2004"; (b) "despite that promise, she did not ship the [P]roperty"; (c) she "retained the [P]roperty"; and (d) that she "charged Mrs. O'Brien for the storage accruing after that date." Id. ¶201.

191. Although Rogovin "promised[d]" to ship the Property without finalization of paperwork, it "did not fulfill that promise" even though "[i]t was something that was solely within [her] power to do so." Id. ¶203.

192. She admitted that the number of such failures is "a significant departure from the norm." Id. ¶207.

193. Ms. Rogovin testified on examination by Rogovin's counsel that Rogovin had failed to ship the Property because plaintiff did not provide a declaration of value or other insurance-related paperwork. However, upon redirect examination by plaintiff's counsel, Ms. Rogovin admitted

that she had failed to provide plaintiff with the paperwork related to shipment value and insurance, or which would have otherwise given plaintiff the option to select or decline coverage.  <u>Id.</u> ¶208.

194. Ms. Rogovin's description of Rogovin's billing practices, and why it would get so far behind, included statements that Rogovin is "a very small business," that "the billing is very complicated," that "[i]t's a terrible business," that there are "all different kinds of shipments," that there are "all different kinds of rules," that "[t]he accounting is terrible," that when one person quits, the business is "really in a lurch," that even a CPA could not help, and that "there wasn't anyone trained . . . to do billing [or] that understood billing."  <u>Id.</u> ¶209.

195. Ms. Rogovin's best estimate or guess was that plaintiff's account was one of only 3 or 4 accounts, out of Rogovin's 40 to 100 active accounts at the time, that were so far behind.  <u>Id.</u> ¶210.

196. Rogovin's normal billing practices for invoicing storage charges was every three (3) months. <u>Id.</u> ¶211.

197. Plaintiff's account was behind as much as seven or eight years.  <u>Id.</u> ¶212.

198. Storage costs are calculated based on the weight of the goods. However, the weight of plaintiff's Property had not, and could not have, changed after January 2001. Id. ¶213-14.

199. Ms. Rogovin agreed that, since the weight had not changed since January 15, 2001, "the only thing Rogovin had to do to charge [plaintiff] for storage was to look at a calendar." Id. ¶215.


Conclusions of Law

    A.   Count One: Replevin

Count One of plaintiff's Amended Complaint for Replevin was not at issue at trial. [Doc. #70 ¶¶1-21]. This Court granted plaintiff's Motion for Prejudgment Remedy of Replevin on February 28, 2005. [Doc. #59]. Defendant released plaintiff's property from its warehouse on April 5, 2005. [Stip. ¶19]. Plaintiff abandoned the replevin claim by stipulation for purposes of narrowing the issues for trial. [Doc. #151 at 29-30]. Accordingly, no issues were tried under Count One of the Amended Complaint.

B.   Count Two: Damages for Wrongful Detention

The Court (Eginton, J.) determined in ruling on plaintiff's motion for summary judgment that plaintiff was "entitled to any damages caused by defendant's wrongful detention of her property," pursuant to Conn. Gen. Stat. §52-515.[7] [Doc. #109 at 5]. Judge Eginton found that "defendant wrongfully detained plaintiff's property from at least February 16, 2004 until April 5, 2005, the date on which defendant released the property from its warehouse." [Doc. # 109 at 7].  Plaintiff seeks compensatory damages as well as an award of exemplary/punitive damages under Count Two. [Doc. #151 at 30].

_____      Compensatory Damages

1.   Standard of Review

"Replevin is a purely statutory action. Section 52-515 of the [Connecticut] General Statutes authorizes the recovery of damages for . . . wrongful detention." Staub v. Anderson, 152

_____

[7]Conn. Gen. Stat. §52-515 provides,

    The action of replevin may be maintained to
    recover any goods or chattels in which the
    plaintiff has a general or special property
    interest with a right to immediate possession
    and which are wrongfully detained from him in
    any manner, together with the damages for
    such wrongful detention.

47

Conn. 694, 695 (1965) (citations omitted). "Damages in such an action can be the depreciation in value of the property wrongfully detained, and loss of use of the property during wrongful detention." Taylor v. Moffat, No. CV 054017734, 2008 WL 1948036, *2 (Conn. Super. Ct. Apr. 18, 2008) (citing Staub v. Anderson, 152 Conn. 694, 695 (1965) and Commercial Credit Corp. v. Miron, 108 Conn. 524, 526 (1928)).

"In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages. [She] need not prove the amount of loss with mathematical precision; but the [fact finder] is not allowed to base its award on speculation or guesswork." Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992). "It is axiomatic that the burden of proving damages is on the party claiming them. When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." Expressway Associates II v. Friendly Ice Cream Corp. of Connecticut, 218 Conn. 474, 476-77 (1991) (citations omitted). Additionally, where the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant, a fact finder "has some latitude to make a just and reasonable estimate of damages based

on relevant data." Raishevich v. Foster, 247 F.3d 337, 343 (2d

Cir. 2001) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S.

251, 264 (1946)(internal quotation marks omitted)); Grace v.

Corbis-Syqma, 487 F.3d 113, 119 (2d Cir. 2007)). "It is then the

province of the trier of fact to weigh the evidence presented and

to determine the credibility and effect to be given the

evidence." Gargano v. Heyman, 203 Conn. 616, 620 (1987).


### 2.   Reasonable Damages

This Court has already found that defendant wrongfully

detained plaintiff's Property from February 16, 2004 until April

5, 2005.  At trial, plaintiff presented evidence of lost rental

income caused by defendant's wrongful detention of the Property.

Plaintiff seeks lost rental income from 2004 and 2005 and

overpayment for storage fees in the total amount of $262,149.08,

as follows,


| | |
|---|---|
| Five (5) weeks 2004 rental income | $ 95,094.36 |
| Two (2) additional weeks 2005 rental income | $ 36,802.14 |
| Lost BBC rental in 2005 | $122,742.00 |
| Storage Fees-Overpayment | $  7,510.58 |

$262,149.08

 As a preliminary matter, defendant correctly argues that, pursuant to the rental agreement, plaintiff was obligated to pay a commission to her rental agency Quality Villas in the amount of twenty percent (20%). [Def. Ex. 509, 510, Doc. #149 at 206].

The Court has carefully considered the record and testimony from Quality Villas' rental agent Sally Ahye, which the Court credits, and awards damages equal to five weeks of lost rental income in 2004 in the amount of $76,075.49, which is $95,094.36 less the twenty percent (20%) commission plaintiff would have paid to Quality Villas.

The Court awards plaintiff damages equal to one week of lost rental income in 2005 in the amount of $14,720.86, which is $18,401.07 less the twenty percent (20%) commission plaintiff would have paid to Quality Villas. The court credits Sally Ahye's testimony that Fos would have had increased rental income in 2005, had it been the second rental season.

The Court declines to award plaintiff the lost BBC rental in 2005. Plaintiff has not shown that the BBC's withdrawal of funding for the project was in any way influenced by Rogovin's wrongful detention of the property, nor has plaintiff shown with reasonable certainty that the BBC would have rented Fos in 2004

50

"before the changing of the guard" when funding might or might not have been available.

The Court awards plaintiff $7,510.58 for storage overcharges during the wrongful detention period.

Accordingly, the Court awards compensatory damages for the wrongful detention of plaintiff's Property in the amount of $98,306.93 ($76,075.49 lost rental income 2004, $14,720.86 lost rental income 2005, plus $7,510.58 storage overcharges).

Exemplary/Punitive Damages

Plaintiff also seeks exemplary/punitive damages in the form of attorneys' fees and costs in the amount of $202,315.93, caused by defendant's wrongful detention of the Property.

Our Connecticut Supreme Court has long recognized that exemplary/punitive damages are appropriate damages in wrongful detention cases involving "malice, gross negligence **or** oppression."[8] Hall v. Smedley Co., 112 Conn. 115, 120 (1930)

---

[8]"Gross negligence" is "less than recklessness." Doe v. Lasaga, No. CV990430858S, 2004 WL 503699, *4 (Feb. 25, 2004) (noting that the Connecticut Supreme Court has not specifically defined "gross negligence, but that it is "more than negligence and less than recklessness.").

"Recklessness" has been defined by the Connecticut Appellate Court in the case of Advanced Financial Serv. v. Associated

(emphasis added).  "It is not necessary for actual intention to do harm to be proven for punitive damage award to be upheld." Chaspek Mfg. Corp. v. Tandet, No. CV 9309-2714 SNBR-429A, 1995 WL 447948, *11 (Conn. Super. Ct. June 16, 1995) (citing Linsley v. Bushnell, 15 Conn. 225, 235 (1842); Collens v. New Canaan Water Co., 155 Conn. 477, 490 (1967)).

"Under Connecticut common law, the term 'punitive damages' refers to the expenses of bringing the legal action, including attorney's fees, less taxable costs."  Catalina v. Nicolelli, 90 Conn. App. 219, 225, n.2 (2005) (quoting Larsen Chelsey Realty

_____

Appraisal Serv. Inc., 79 Conn. App. 22, 37-38 (2003).

> Recklessness is a state of consciousness with reference
> to the consequences of one's acts . . . . It is more
> than negligence, more than gross negligence . . . .
> The state of mind amounting to recklessness may be
> inferred from conduct. But, in order to infer it, there
> must be something more than a failure to exercise a
> reasonable degree of watchfulness to avoid danger to
> others or to take reasonable precautions to avoid
> injury to them . . . .[R]eckless conduct tends to take
> on the aspect of highly unreasonable conduct, involving
> an extreme departure from ordinary care, in a situation
> where a high degree of danger is apparent . . . . It is
> at least clear . . . that such aggravated negligence
> must be more than any mere mistake resulting from
> inexperience, excitement, or confusion, and more than
> mere thoughtlessness or inadvertence, or simply
> inattention . . . .

Co. v. Larsen, 232 Conn. 480, 517 n.38 (1995)); see also Alaimo v. Royer, 188 Conn 36, 42-43 (1982) (the two terms, "punitive damages" and "exemplary damages" "are merely alternate labels for the same remedy."); Harty v. Cantor Fitzgerald and Co., 275 Conn. 72, 93 (2005) ("Alaimo makes clear that punitive damages and exemplary damages are one and the same under Connecticut law"); see also Matthiessen v. Vanech, 266 Conn. 822, 826 n.5 (2003) ("[punitive] damages also are known as 'exemplary' damages").

Plaintiff argues that at a minimum defendant's conduct constituted gross negligence, contending that the record also supports a finding of reckless conduct. The Court agrees.[9]

It is stipulated that defendant was on notice[10] prior to the

---

[9]The parties extensively briefed the legal standard for "gross negligence" versus "recklessness." Plaintiff argues that at a minimum defendant's conduct constitutes gross negligence. The Court declines to address the distinction as I find on this record that defendant's conduct was recklessly indifferent to the damages caused by the prolonged wrongful detention of the Property.

[10]"On January 25, 2004, Mr. Denis O'Brien . . . sent defendant a fax, received by defendant, repeating earlier requests that defendant forward relevant documents and a bill relating to the upcoming shipment of property. Mr. O'Brien emphasized to defendant that the Property was necessary in order to furnish Fos, that Fos could not be rented without the Property, and that the Property had to be shipped no later than February 15, 2004, in order to arrive in time for the 2004 summer season." [Stip. ¶ 8].

February 15, 2004 "drop-dead date" that delivery of the Property was necessary in order to furnish Fos, that Fos could not be rented without the Property, and that the Property had to be shipped no later than February 15, 2004 in order to arrive in time for the 2004 summer rental season. [Stip. ¶8]. It is further stipulated that the Property was not timely delivered as a result of "repeated[] fail[ure]" by defendant, that defendant gave "false assurances" regarding its intent to perform, and that defendant repeatedly failed to perform despite being aware of the serious potential consequences, namely the loss of the entire 2004 rental season. [Stip. ¶¶9-10]. It is stipulated that on March 15, 2004, defendant was contacted by plaintiff's lawyer "in an effort to obtain the Property." [Stip. ¶11]. Indeed, "[u]nable to reach a satisfactory arrangement, plaintiff initiated this litigation and filed a motion for prejudgment remedy of replevin on July 13, 2004." [Stip. ¶15]. "Defendant released plaintiff's Property from its warehouse on April 5, 2005. [Stip. ¶19].

Defendant argues, in part, that "[p]laintiff attempts to transform a certain amount of slow service, miscommunication, inattentiveness and perhaps neglect into something that was "reckless," or worse, in order to claim attorneys fees." [Doc.

#152 at 19].

Based on this record, it cannot be seriously argued that, defendant was unaware of the legal consequences of its continued detention of plaintiff's Property. Advanced Financial Serv., Inc. v. Associated Appraisal Serv, Inc., 79 Conn. App. 22, 37 ("The state of mind amounting to recklessness can be inferred from conduct."). The Court finds that the record supports a finding that defendant acted in a "highly unreasonable" and reckless manner. Id. ("recklessness" "must be more than a mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . .").

Although Rogovin could have reasonably complied with plaintiff's requests within four days, it failed to perform for over a ten month period of time. It failed to invoice plaintiff for storage for years, despite a regular practice to invoice storage charges every three months. When Rogovin finally did produce an invoice [Pl. Ex. 8], ten months after plaintiff began requesting/demanding it, it was a single page document containing minimal information from Rogovin's computer system and/or paper files for three to eight years [Pl. Ex. 16, Rogovin Tr. at 124-31] (where Ms. Rogovin admits that data was in the computer as

55

early as 1996, that if it was not yet in the computer it was still kept in paper form, and that Rogovin did not check either location until March 26, 2004) and [Rogovin Tr. at 2001-02] (where Ms. Rogovin admits that all information related to plaintiff was kept in a small paper file at Rogovin, that it was necessary only to go through that file and enter dates into the computer, and that, despite the ease of that task, she did not do so until after the February 15, 2004 "drop-dead date"). Moreover, most or all of the information that plaintiff requested over the ten month period was "always known" by defendant.

One of defendant's principals, Sarah Rogovin, asserted that her repeated failures to address plaintiff's requests was because she was not "functioning well" after her mother's death in July 2003. However, she did not ask for the assistance of her brother, Aaron Rogovin, another principal of defendant, until eight to ten months after plaintiff began requesting the Property and documentation, and a month <u>after</u> the agreed upon "drop-dead date," even though she had been promising plaintiff she would seek her brother's assistance and despite the undisputed evidence that he was not suffering from any business or personal problems. Mr. Rogovin also did not accept or return Mr. O'Brien's telephone calls. Ms. Rogovin was "selectively not functioning" as she

estimated that plaintiff's account was one of only three or four
accounts that were so far behind, out of Rogovin's forty to one
hundred active storage accounts at the time. Normal practice was
to bill for storage charges every three months, and plaintiff's
account was behind as much as seven or eight years.  This pattern
cannot solely be attributed to plaintiff's mourning process.

Defendant stipulated that Sarah Rogovin "dreaded speaking
with Mr. O'Brien and her false assurances regarding the imminent
production of the invoice and shipment were offered merely to
pacify him." [Stip. ¶10]. Ms. Rogovin also admitted that she had
no such problems with other customer other than plaintiff.

It is undisputed that, during the entire ten month period
during which plaintiff was requesting an invoice, there was a
bookkeeper employed at Rogovin, Theresa Dovas, who could have
easily generated the invoice from the data in Rogovin's computer
but Ms. Rogovin did not ask Ms. Dovas to undertake that simple
task until six weeks <u>after</u> the "drop-dead date" for shipment.
[Pl. Ex. 16, Rogovin Tr. at 132-35].  The evidence establishes
that Ms. Rogovin never checked the computer herself to see if the
information being requested by plaintiff was there.

The evidence demonstrates that Ms. Rogovin did not begin
compiling the information necessary to prepare an invoice until

April 2, 2004, more than six weeks after the "drop-dead date" for shipment, more than two months after receiving written correspondence demanding information, and more than eleven months after the invoice was first requested by Mr. O'Brien. [Pl. Ex. 16, Rogovin Tr. at 206-07] (testifying she did not begin to prepare the invoice until April 2, 2004). She intentionally chose this course of conduct despite being aware of the potential consequences, that Rogovin's failure to perform would cause plaintiff to lose the 2004 rental season, and in the face of "countless" phone calls, correspondence and warnings by Mr. O'Brien regarding the "extremely serious" ramifications of delay. [Stip. ¶8].

Thereafter, Rogovin invoiced plaintiff for storage of the Property during the time Rogovin was wrongfully detaining it, which Ms. Rogovin admitted was "unfair," and billed plaintiff for "handling charges" that were inflated over one thousand percent.

In the face of repeated requests, demands, and warnings, and with full knowledge of the ramifications of its actions or inactions, defendant took over ten months to perform a job that reasonably should and could have been performed in four days. Indeed, Rogovin admits that (1) these "mistakes" are the exception rather than the norm; (2) it is Rogovin's standard

practice to live up to its word and fulfill its promises; and (3)
it is Rogovin's standard practice to perform in a timely manner.
Rogovin further admits that (1) untimely performance is an
"aberration," and a "departure from the normal standard"; (2)
that a failure to comply with a customer's request, and to
fulfill a promise to that customer, is departure from ordinary
business practices; and (3) that repeated failures to comply with
a customer's requests, and to fulfill a promise, is even further
from the norm than a single instance of conduct.[11]

"Recklessness is a state of consciousness with reference to
the consequence of one's acts . . . ." <u>Advanced Fin. Serv., Inc.</u>,
79 Conn. App. at 37. "[T]here must be something more than a
failure to exercise a reasonable degree of watchfulness to avoid
danger to others <u>or</u> to take reasonable precautions to avoid
injury to them . . . ." <u>Id.</u> On this record, plaintiff has
established that defendant's conduct was reckless. Accordingly,
the Court awards as exemplary/punitive damages the reasonable
attorneys' fees and costs incurred by plaintiff to bring this

---

[11]Sarah Rogovin admitted to making numerous promises,
failing repeatedly to fulfill those promises, and that it was
solely in her power whether or not to fulfill them. She admitted
that her repeated failure to fulfill her promises were a
"significant departure from the norm."

replevin action to recover the Property and damages for its wrongful detention.

Attorneys' Fees

Plaintiff seeks exemplary/punitive damages in the form of attorneys' fees and costs in the amount of $202,315.93. At trial, plaintiff submitted evidence of the attorneys' fees she incurred which, through trial, totaled $151,052.76 (Pl. Ex. 19). Those fees total $202,315.93 through the end of January 2008 (Doc. #151, Ex. A). Plaintiff also seeks leave to file a supplemental attorneys' fees affidavit regarding fees incurred through the date of judgment.

Defendant generally objects to an award of exemplary/punitive damages under the replevin statute as an element of damages for the wrongful detention of the Property. [Doc. 152 at 17]. It adds, "[a]lthough defendant did not challenge the reasonableness of the amount of fees, it is not clear why the plaintiff was billed for work of two attorneys, at least during the time when she was represented by Pullman & Comley. [Defendant's counsel] never once spoke to Attorney Shearin or Attorney Rouse during the course of this case." [Doc. #155 at 11 n.2]. However, Defendant presents no proposed

findings of fact or conclusions of law related to such issues as the reasonableness of hourly attorneys' fees, or the hours expended.

The Court will reserve decision on the amount of attorneys' fees and costs. Plaintiff will file a supplemental petition for all the attorneys' fees and costs sought in this case through the entry of judgment. The Court requests that plaintiff break out the attorneys' fees separately from the costs. The affidavit filed in support of the petition should identify by name the individual attorneys and paralegals listed on billing statements, their billable hour rates and years of experience. Plaintiff is advised to carefully review D. Conn. L. Civ. R. 54, before submitting a final request as costs will only be allowed in accordance with the local rule. <u>See</u> D. Conn. L. Civ. R. 54(c)(7) (Items Not Taxable as Costs).


<u>     C.   Count Three: Violation of CUTPA</u>

In Count Three, plaintiff alleges that defendant Rogovin violated Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. §42-110(b)(a), by engaging in "unfair and deceptive acts or practices in the conduct of trade or commerce that are unethical, unscrupulous and offensive to public policy. . . ." Amend. Compl.

61

¶¶27-33.  Plaintiff seeks compensatory and punitive damages under CUTPA.

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity."  Larsen Chelsea Realty Co. v. Larsen, 232 Conn. 480, 492 (1995).  CUTPA provides that, "[no] person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. §42-110b(a).  "Trade or commerce . . . is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  Larsen Chelsea Realty Co., 232 Conn. at 492, (quoting Conn. Gen. Stat. § 42-110a(4)).

With regard to establishing a CUTPA violation, the Connecticut Supreme Court has stated:

> It is well settled that in determining
> whether a practice violates CUTPA we have
> adopted the criteria set out in the cigarette
> rule by the Federal Trade Commission for
> determining when a practice is unfair: (1)
> [Whether the practice, without necessarily
> having been previously considered unlawful,
> offends public policy as it has been
> established by statutes, the common law, or
> otherwise-in other words, it is within at
> least the penumbra of some common law,

> statutory, or other established concept of
> unfairness; (2) whether it is immoral,
> unethical, oppressive, or unscrupulous; (3)
> whether it causes substantial injury to
> consumers, [competitors or other business
> persons] . . . . All three criteria do not
> need to be satisfied to support a finding of
> unfairness. A practice may be unfair because
> of the degree to which it meets one of the
> criteria or because to a lesser extent it
> meets all three.

Ventre v. Goodspeed Airport, LLC, 275 Conn. 105 155 (2005)

(internal quotation marks omitted). CUTPA, however, "imposes no

requirement of a consumer relationship." Larsen Chelsea Realty

Co., 232 Conn. at 496.

Defendant's wrongful detention of plaintiff's Property does

not rise to the level of a CUTPA violation. Although the Court

found that defendant wrongfully detained plaintiff's property,

the property was returned pursuant to a replevin action and the

Court has awarded compensatory damages and exemplary/punitive

relief in accordance with this ruling. The CUTPA allegations

simply incorporate by reference the replevin and wrongful

detention claims and do not set forth how or in what respect the

defendant's activities were "immoral, unethical, unscrupulous or

offensive" to public policy. The Court finds that expanding an

individual action for replevin and wrongful detention into a

CUPTA violation requires more. Although the Court has found

defendant's conduct reckless, it was conduct directed solely at plaintiff and her husband. Harmful as it was, defendant's conduct was a breakdown in a business relationship with one particular customer and did not amount to a general business practice or policy directed at consumers at large. Plaintiff has not shown that defendant engaged in an unethical or unscrupulous general business practice beyond the evidence giving rise to plaintiff's replevin and wrongful detention claims. That is not to say that a violation of the replevin statute cannot also be a violation under CUTPA; however, the Court does not find sufficient aggravating factors here.  Accordingly, judgment will enter in favor of defendant Rogovin on Count Three.


     D.   <u>Prejudgment and Post Judgment Interest</u>

Additionally, the Court finds that an award of prejudgment and post judgment interest at the statutory rate of ten percent (10%) is warranted.  The allowance of prejudgment and post judgment interest under Conn. Gen. Stat. §37-3a "as an element of damages is primarily an equitable determination and a matter within the sound discretion of the trial court."  <u>Metcalfe v. Talarski</u>, 213 Conn. 145, 160 (1989) (prejudgment interest); .<u>TDS Painting & Restoration, Inc. v. Copper Beech Farm Inc.</u>, 73 Conn.

App. 492, 510-11 (Conn. App.) (post judgment interest), <u>cert.</u>
<u>denied</u>, 262 Conn. 925 (2002).  Whether to award prejudgment
and/or post judgment interest turns on whether the detention of
the money was wrongful under the circumstances.  <u>See</u> <u>Spearhead</u>
<u>Construction Corp. v. Bianco</u>, 39 Conn. App. 122, 134-35 (Conn.
App.), <u>cert. denied</u>, 235 Conn. 928 (1995); <u>T.D. Painting &</u>
<u>Restoration, Inc.</u>, 73 Conn. App. at 511-12 (post judgment
interest); <u>Lawrence v. New Hampshire Ins. Co.</u>, 29 Conn. App. 484,
498, <u>cert. denied</u>, 224 Conn. 923 (1992).  Here, defendant
wrongfully detained plaintiff's Property resulting in a loss of
rental income and wrongfully charged storage fees after February
16, 2004 until the time the property was released on April 5,
2005.

Prejudgment interest, awarded pursuant to §37-3a, runs from
August 31, 2004, on the amount of $76,075.49; from August 31,
2005, on the amount of $14,720.86; and from September 15, 2004,
on the amount of $7,510.58, until the date judgment enters.[12]
<u>Cabrera v. G.T. Construction</u>, 3:05CV812, 2006 WL 1272618, *1 (D.

---

[12]August 31, 2004 is a reasonable determination of when
plaintiff would have received all the lost 2004 rental income.
August 31, 2005 reasonably represents when plaintiff would have
received all the lost 2005 rental income. September 15, 2004 is
the date plaintiff paid the storage fees for the period of
wrongful detention.  (Pl. Ex. 11).

Conn. Mar. 27, 2006).

"It follows, therefore, that post judgment interest, also awarded pursuant to §37-3a, begins to run from the date of judgment." T.D. Painting & Restoration, Inc., 73 Conn. App. at 511 (Post judgment interest "shall be calculated from the date of the final judgment to the date of payment.") (citing O'Leary v. Industrial Park Corp., 211 Conn 648, 653-54 (1989)).

Accordingly, plaintiff's motion for prejudgment and post judgment interest is **GRANTED**.

        E.   Defendant's Counterclaim

Defendant seeks payment for the warehouse handling charge, contending that "plaintiff's goods would have had to have been removed from storage, and labor performed, irrespective of whether the property was leaving the warehouse voluntarily or involuntarily, i.e. by court order." [Doc. #152 at ¶21]. The Court agrees.  Defendant's counterclaim for payment of handling charges is granted in the amount of $1,524.97, which shall be credited against the damages awarded to plaintiff at the time the damages are paid.  The Court declines to award interest on this amount.

CONCLUSION

Based on the foregoing, the Court enters judgment for plaintiff on Count Two for Wrongful Detention and in favor of defendant on Count Three for CUTPA violation, and on defendant's counterclaim.[13]

The Court awards damages as follows,

Compensatory damages to plaintiff in the amount of $98,306.93, plus interest in accordance with this ruling.

Exemplary/Punitive damages to plaintiff in the form of reasonable attorneys' fees and costs.  Plaintiff will file a Supplemental Motion for Attorneys' Fees and Costs with supporting documentation in accordance with this ruling in fourteen (14) days.

Handling charges to defendant in the amount of $1,524.97, to be credited against the damages awarded to plaintiff at the time of payment.

This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #142] on November 30, 2007, with appeal to the Court of Appeals.

_____

[13]Count One for Replevin was resolved in plaintiff's favor on summary judgment. [Doc. #109 at 5]. Plaintiff stipulated to the abandonment of the replevin claim for purposes of narrowing the issues for trial. [Doc. #151 at 29-30].

ENTERED at Bridgeport this 30th day of September 2008.


                              ___/s/_____
                              HOLLY B. FITZSIMMONS
                              UNITED STATES MAGISTRATE JUDGE